[No. 5056.]

NOON TUCKER *v.* THE STATE.

1. PRACTICE—CONTINUANCE—NEW TRIAL.—See the statement of the case for evidence set forth in an overruled application for a continuance which, considered in connection with the evidence adduced upon the trial, is *held* to have demanded the award of a new trial.

2. THEFT—CHARGE OF THE COURT.—The defense requested the trial court to charge in a theft case as as follows: "If you find that M. A. Tucker drove up the yearling in question, and that defendant, after it was brought to his lot, opened the gate and had nothing to do with the original taking and driving, you will acquit, and this is so, no matter what connection defendant had with it thereafter." *Held*, that the charge being pertinent and applicable to the facts in proof it should have been given.

APPEAL from the District Court of Limestone. Tried below before the Hon. L. D. Bradley.

The indictment charges the appellant and his father, M. A. Tucker, jointly, with the theft of a yearling, the property of George Lewis, in Limestone county, Texas, on the fifteenth day of July, 1884. The appellant, being alone upon trial, was convicted, and his punishment was assessed at a term of two years in the penitentiary.

George Lewis was the first witness for the State. He testified that he lived in Limestone county, Texas, in which county he owned a stock of cattle. He was absent from the State in June, 1884, and left his stock of cattle in charge of Mr. James Harper, whom he had employed as his ranch "boss." Witness's ranch was located at Big Hill, in Limestone county, about six miles distant from the house of the defendant. In June, 1884, witness had a herd of his cattle, consisting of yearlings and two year olds, driven from his said ranch, in Limestone county, to Abbott, in Hill county. The most direct route from the ranch to Abbott was through the neighborhood in which the defendant lived. The witness did not know the route over which Harper drove the cattle to Abbott, but he knew that the cattle were delivered in Abbott during the fall of 1884. Acting upon certain information received, the witness, in August or September, 1884, sent Mr.

Harper to Mr. Bachelor's place to see about a yearling. Witness did not see the said yearling brought to his house, but in December, 1884, or January, 1885, he saw a yearling in his pasture which was said to have been brought there by Harper. Harper showed the yearling to witness. Witness knew that yearling to be his only by the brand and by what Mr. Harper told him. The UO brand on the yearling had been changed into NOON. The change was very plain, particularly the transformation of the U in to an O. The letter T was also branded on the jaw. During the preceding spring, the witness branded the letter T on the jaw of both of his yearlings. The record of marks and brands showed the register of the brand of Lewis & Johnson to be UO on the right side, and the mark of the same parties as a crop and under bit in each ear. Witness testified that he and George Johnson were partners, and owned the said brand until fall of 1882, when witness purchased Johnson's interest and retained the brand.

James Harper testified, for the State, that in 1884, he was in the employ of George Lewis. Lewis was absent from Texas in June, 1884. In June of that year the witness, acting under the directions of Mr. Lewis, took a herd of Lewis's cattle from Limestone county ranch to the town of Abbott, in Hill county. He started with the cattle on the seventeenth or eighteenth of the month, and drove them through the neighborhood in which the defendant lived. The yearlings comprised in that herd were branded in the UO brand and the letter T on the jaw. In August or September, 1884, Mr. Lewis sent the witness to Mr. Batchelor's place to examine a certain yearling. In Drennan's pasture, which was near the places of Batchelor and defendant, witness found a red yearling with a white belly, which yearling was branded NOON. The brand was then peeling. Witness recognized that yearling before he got within fifty yards of it. He knew it to be one of Lewis's yearlings. Witness milked its mother while it was a calf. He branded it in the UO brand and put a T on its jaw. That UO brand had been changed into NOON, and the change was plainly perceptible. That yearling was one of several lost from the herd taken from the Limestone county ranch to Abbott. Witness was unable to say how many yearlings he lost from that herd en route to Abbott. Some time after recovering the yearling in question he found another yearling on the prairie the brands on which had been similarly changed to NOON. The witness further stated that, in May, 1884, he drove a herd of

Lewis's cattle over the route through the defendant's neighborhood, which said herd contained from fifty to one hundred head in the UO brand.

William Calvary testified, for the State, that some time in July, 1884, he assisted the defendant in driving a red yearling from his father's house in Limestone county to Drennan's pasture. That yearling was driven to the pasture for Mr. T. J. Batchelor. Witness went with Batchelor to the defendant's house to get the yearling. He, Batchelor, and defendant started to Drennan's pasture together, with the yearling, but Batchelor did not go all of the way. After Batchelor left witness and the defendant, the two latter met Mr. Jo Thetford, who rode with them to the pasture. Thetford made some inquiry about the yearling, and defendant said that it was the calf of a certain cow his father owned, and that he had raised it from a calf. The yearling was then fresh branded NOON. It was turned in to Drennan's pasture. Defendant lived with his father, M. A. Tucker.

Cross-examined, the witness stated that he had known Jo Thetford for a long time. Jo was a great wag, and was otherwise noted for his habit of asking questions. There was nothing in Jo's question about the yearling to indicate a lurking joke. He merely asked defendant where he got that yearling.

T. J. Batchelor testified, for the State, that he lived at Horn Hill, in Limestone county, Texas. In June, 1884, the defendant lived at the foot of Honest Ridge, about a mile and a half from the witness, and in the same county. Witness was the proprietor of a small store at Horn Hill in 1884. In the spring of that year M. A. Tucker, the defendant's father, agreed to let the witness have some yearlings. Some time after the middle of July, M. A. Tucker come to the witness's store, and told him that he had a yearling at home for the witness; that he got home from some where on the evening before, and that his son, the defendant, would deliver the yearling on the next day. He told the witness that the yearling was branded NOON. On that or the next day, the witness went to M. A. Tucker's to get the yearling. M. A. Tucker was not at home, but the defendant helped the witness drive the yearling to Drennan's pasture. Witness did not go all of the way from Tucker's house to Drennan's pasture with the defendant and the yearling. Witness did not see M. A. Tucker when he got the yearling, but, a few days later went back to Tucker's house to get a hog, when Tucker executed his

bill of sale for the yearling. Witness bought the said yearling from M. A. Tucker, and understood that he, witness, was getting the yearling from said M. A. Tucker. Witness knew Mr. Gullett, who was at Tucker's house when witness got the bill of sale for the yearling, and the hog from Tucker. Gullett then and now lived in Navarro county. Witness knew that M. A. Tucker had a law suit in Waco about some sheep. Defendant came home from school at Mount Calm during the fall of 1883, since when, as witness understood, he had traded a little in cattle. The brand was peeling off when witness got the yearling.

E. G. Moody testified, for the State, that he lived near M. A. Tucker's house, on Honest Ridge, in Limestone county. In passing Tucker's house in July, 1884, witness saw M. A. Tucker driving up two yearlings in the UO brand. Defendant held the lot gate open while his father, M. A. Tucker, drove the yearlings in to the lot. Witness passed back over the same route within the next two hours, and saw the same yearlings in a grass lot near M. A. Tucker's house. The UO brand had been recently changed in to NOON. An N had been placed before and after the UO; the U had been changed in to an O, and the original O had been run over.

Cross-examined, the witness testified that he had no ill feeling towards M. A. Tucker. M. A. Tucker did, in the winter of 1884–5, charge witness with the theft of his watch, and witness was searched, as were five or six other persons at the same time and place. The witness understood that M. A. Tucker got Mr. Love to look out for his watch after he, witness, was arrested. Witness did not propose to M. A. Tucker that if he, M. A. Tucker, would assist him in two murder cases pending against him, he would testify for M. A. Tucker in this case. Witness testified against M. A. Tucker at his trial in Marlin for the theft of the yearling involved in this prosecution, and he testified on that trial that while defendant held the gate open M. A. Tucker drove the yearlings in to the lot. M. W. Foster and his son Sam were present when M. A. Tucker drove the yearlings in to the lot through the gate held open by the defendant. Witness saw one of the yearlings in Bennett's pasture, a few days after he saw the two yearlings penned by M. A. Tucker. It was put in that pasture, the witness thought, on the night after the brand was changed. On the same evening that he saw that yearling in Bennett's pasture he told John Bennett that he saw M. A. Tucker drive up that yearling and pen it at his house, and that it was

then branded UO; and that he saw it again on the same evening in M. A. Tucker's lot after the brand had been changed to NOON. He advised John Bennett to turn the yearling out, and told him that it belonged to George Lewis, and was stolen property. Witness was shown, on the trial of M. A. Tucker, at Marlin, a letter which purported to have been written by witness to M. A. Tucker. Witness did not write that letter in whole or in part. Neither the body of the letter nor the signature was in the witness's hand writing.

John Perkins testified, for the State, that he lived on Steele's creek. On or about the first of May, 1884, the defendant came to his house to notify him of the death of his cousin on Honest Ridge. Witness and defendant rode to Honest Ridge together En route, they passed a herd of cattle being driven on the road. Defendant called witness's attention to the brand, UO, which he said could be easily changed to his brand. He then laughed, and said that he wished the cattle would stampede. Witness had no recollection of relating this incident to any one except Mr. John Barron, whom he told a few days after it occurred. Witness was first subpœnaed in this case a day or two before this trial. Witness knew George Parker. He told Parker on the day before this trial that he knew nothing about this case. Witness knew that Parker felt some interest in this case, but he did not consider that his evidence was any of Mr. Parker's business. Witness saw Mr. George Lewis, for the first time, on the day before this trial.

Gaston Thetford testified, for the State, that he lived at Horn Hill, near Batchelor's store. In June, 1884, witness saw a herd of one and two year old cattle in the UO brand pass through that neighborhood, going in the direction of Abbott. On the next day the witness saw a UO yearling in Drennan's pasture. That yearling was kept in that pasture for two or three weeks, when witness saw it outside on the range. Two or three weeks later, the witness saw the same yearling put back in to Drennan's pasture for Mr. T. J. Batchelor. It was put in that pasture by defendant and Will Calvary. The UO brand had been changed— run over into NOON. Witness did not, on either occasion, observe the letter T on the yearling's jaw. Drennan's pasture fence was but three wires high, and could be entered by yearlings. Witness did not know how the UO yearling got in to that pasture in the first instance. Witness first saw the letter T on the yearling's jaw when Harper called his attention to it when

he came to Drennan's pasture to get it. Harper knew the yearling as soon as he saw it. Witness's brother, Jo Thetford, was detained at home by the sickness of his wife.

Walter Thetford testified, for the State, substantially as did Gaston Thetford, except that he did not see the yearling turned in to Drennan's pasture by the defendant and Calvary, nor did he see defendant and Calvary driving it. The State closed.

Mrs. Celia Foster was the first witness for the defense. She testified that, in 1884, she occupied M. A. Tucker's house, in Limestone county, and M. A. Tucker and his son, the defendant, lived with her. Witness and her husband and family took charge of the Tucker place in February, a short time after the defendant's return from the Mt. Calm school. Defendant speculated somewhat in cattle during the year 1884. Witness generally held his money for safe keeping. One day, as near as witness could remember, between the twelfth and fifteenth of July, the defendant bought two yearlings, one of which, a few days later, was delivered to Mr. Batchelor. Between one and two o'clock on the day of the purchase, the defendant got his remaining twenty dollars to pay for two yearlings he bought. Witness went to the lot to get a bucket of water, and saw two strange men branding the yearlings. One of those men was spoken to, the witness thought, as Warner, and the other as Jack. Bob Hodge may have been at the front gate when witness gave the defendant the money to pay for the yearlings, but witness did not see him, Dock Hodge was sitting on his horse, on the out side of the gate. Witness saw Mr. Proctor about the place during the evening, and knew that he spent the night at the house. The witness did not see the yearlings when they were driven to the house. She first saw them in the lot when she went to the well. One of the yearlings was, on the next day, sent to Bennett's pasture, and the other was turned in to the grass lot at home and kept there until delivered to Mr. Batchelor, several days afterwards.

M. A. Tucker was not at home when Batchelor came and got the yearling involved in this controversy. He was absent, attending a law suit in Waco. He was gone one or two weeks. On his return from Waco, M. A. Tucker went to Navarro county to get Mr. Gullett's deposition. He was absent on that trip two or three days. Mr. Gullett returned with him, and remained two or three days. Gullett was at Tucker's house when Batchelor came there to get a hog. When the two men

called Warner and Jack got through branding the yearlings; they came to the house with the defendant, and executed a bill of sale for the two yearlings. The bill of sale was given to the witness by the defendant for safe keeping, but was now lost. Witness had made diligent but unsuccessful search for it. M. A. Tucker was not at home when the defendant bought the two yearlings. Witness was before the grand jury, and testified about this matter. She did not testify before the grand jury that the defendant bought (more than?) two yearlings from the strangers. She saw only the two yearlings in the lot, and if there were any cows in the lot at that time, witness did not see them. Witness could give no better description of the strangers than that she remembers one as a dark and the other as a light complexioned man; one between twenty and twenty-five years old, and the other about thirty years old.

M. W. Foster, the husband of Mrs. Celia Foster, testified, for the defense, that he was at home (at the M. A. Tucker place) when the two yearlings were driven up. Witness was inside the house when the yearlings were driven up, and saw them through the door. When witness first saw them they were inside the little pasture in front of the house, and about one hundred yards from the front gate. Defendant, Bob Hodge, and two strangers, were driving the animals when witness first saw them. Witness did not go in to the lot until late that evening, when he saw that the yearlings had been fresh branded NOON. M. A. Tucker was not at home at that time, but was in Waco. Mr. Prator spent the evening of that day, and that night, at Tucker's house. Dock Hodge may have been on the place, but witness did not see him. The witness never, at any time, saw M. A. Tucker drive the yearling involved in this controversy, and another one, to the house. Defendant never, in witness's presence, at any time, held the lot gate open for M. A. Tucker to drive the two yearlings into the lot. This witness testified to M. A. Tucker's movements for the week or two before and after the purchase of the yearlings, substantially as his wife did. Witness saw other cattle out side, in front of the house, when the two yearlings were driven up, but was unable to say whether or not those cattle were driven up with the yearlings, or whether they were there in quest of shade.

Cross-examined, the witness testified that he did not know either Warner or Witherspoon, the men who sold the two yearlings to the defendant, nor had he ever seen them prior to that

transaction. He did not remember whether or not they came in to the house. Prator and Bob Hodge, and the two strangers left the house on that evening before the witness went back to his work. It was about two o'clock in the evening when the yearlings were driven to the house. Witness's eye sight was bad, and the men who brought the yearlings to the house were too far from where he was lying down for the witness to observe them closely. Witness was in the house during the whole of the time that the strangers were on the place, and could give no manner of description of them. Prater came to the house after the strangers left, and before the witness went back to his field to his work. Witness had never, on any former trial or proceeding, testified about Prator's presence at the house. He did not testify before the grand jury that two yearlings branded NOON were put in to the lot. Witness had several times testified before the grand jury about this matter. The witness had never, anywhere, or before any tribunal or authority, testified that the strangers drove up and branded but one yearling NOON. Witness was cross-examined before the grand jury about another NOON yearling, and may have stated that he saw such a yearling on the prairie. Witness was of opinion that, upon one occasion, he testified before the grand jury that the strangers drove up seven or eight other cattle with the one yearling they sold defendant. Several head of cattle were outside of the lot, and witness could not then tell whether they were driven or strayed to that point. Witness first testified that the strangers sold defendant two yearlings, on the trial of M. A. Tucker at Marlin.

R. C. Hodge testified, for the defense, that he lived at Honest Ridge. In 1884, he lived near Tucker's tank, about a half a mile from M. A. Tucker's house. Witness and defendant were together at the tank between the twelfth and fifteenth of July, 1884, watching sheep. Witness left defendant in charge of the sheep about noon and went home to dinner. Witness returned between one and two o'clock and found defendant still at the tank. Within a short time two men calling themselves Warner and Witherspoon came to the tank, and said that they were gathering some stock that had strayed from a herd they drove through the neighborhood during the previous spring. They proposed to sell the strays to the defendant. Warner, Witherspoon, defendant, and witness then drove two yearlings to M. A. Tucker's house and penned them. Defendant bought the two yearlings for fifteen dollars. Witness stopped at the gate and

defendant went in to the house and returned with two ten dollar bills. The men remained in the lot to brand the yearlings, and witness and defendant went back to the tank to see about the sheep. En route to the tank, witness and defendant met witness's brother Dock, who gave defendant change for a ten dollar bill. Dock Hodge went on towards M. A. Tucker's house, and was sitting on his horse at the gate when, an hour later, witness and defendant returned from the tank. While witness and defendant were at the tank, Mr. Prator, driving two cows and calves, joined them, and finally returned with them to the house. By this time the men had got defendant's brand, NOON, on the yearlings. Witness, his brother, and Prator, left as the two parties, Warner and Witherspoon, went in to the house with defendant to execute their bill of sale and receive their money. Witness did not see defendant actually pay the purchase money. Prator ate supper with the witness and his brother that night, and left, going in the direction of M. A. Tucker's house. He said he was going to spend the night at Tucker's. M. A. Tucker was not then at home, nor did he come home for several days.

Cross-examined, the witness stated that he was examined as a witness on the trial of M. A. Tucker, at Marlin, and testified on that trial as he has testified on this. Witness testified to the same facts before the grand jury. Witness could give a no more satisfactory description of Warner and Witherspoon than that given by Mrs. Foster, except that the dark man wore a mustache.

J. B. Prator testified, for the defense, in substance, that on his way to his home in Mexia, Texas, from the ranch of Gatling, which was situated between that town and Waco, he stopped at a tank about four miles from M. A. Tucker's house. This was on the eleventh day of July, 1884. At that tank he met Warner and Witherspoon, the former of whom he knew. He saw Witherspoon once before—in the spring of 1884—when he and Warner passed Gatling's ranch with a herd of cattle, which they said they were driving from Cherokee county to Hamilton county. At the tank, on the day named, Warner and Witherspoon told witness that, on their spring trip with cattle, they lost some of their animals after crossing the Navasota river at Rocky crossing, which crossing was not far from Horn Hill and Honest Ridge. They said they were "sweeping" the range back, in search of the missing animals, and asked witness who, in that

neighborhood, would buy their missing animals, if found. Witness told them that possibly Oliver or defendant would trade with them. They left witness at the tank. This was about eleven o'clock a. m. After dining, witness went on to Tucker's tank, which he reached about three o'clock. He met defendant and Bob Hodge at Tucker's tank, looking after some sheep. Defendant went back to his father's house, and witness and Bob Hodge soon followed. When he got to Tucker's house witness saw Warner and Witherspoon in the lot branding a couple of yearlings. Dock Hodge was at the gate on horseback. Witness did not see Mrs. Foster. Witness went home with the two Hodges, took supper with them, and returned to Tucker's house, where he stayed all night. M. A. Tucker was not at home. Witness attended the trial of M. A. Tucker. at Marlin. as a witness. Witness did not tell George Lewis at the Allen hotel, in Marlin, that he knew nothing about this case. Witness was not subpœnæd in this case until after M. A. Tucker's trial, at Marlin.

Seven or eight witnesses testified that the defendant had always sustained a good reputation for honesty, and that he. was between sixteen and seventeen years old at the time of this trial, and past fourteen at the time the offense was alleged to have been committed.

J. W. Bennett, defendant's cousin, was his next witness. The important matter testified to by him was to the effect that if his pasture contained a yearling in the NOON brand at any time in the summer of 1884, he did not know of it. E. G. Moody never, at any time or place, told witness that such a yearling was in his pasture. He never told the witness that he saw M. A. Tucker driving two UO yearlings in to his lot through a gate held open by defendant, and that he saw the same yearlings in Tucker's lot that same evening after the brand had been changed to NOON.

R. M. Love, sheriff of Limestone county, testified, for the defense, that he has had the State's witness E. G. Moody in jail since the winter of 1884. Witness had seen Moody write frequently, and knew his hand writing. The witness was shown, at Marlin, a letter purporting to have been written by E. G. Moody, and recognized the hand writing, both in the body and signature of the letter, as the hand writing of the said Moody.

The State, in rebuttal, recalled George Lewis, who testified that he heard Bob Hodge's testimony on the trial of M. A. Tucker at Marlin. Hodge said something about Prator taking supper

with him on the night of defendant's alleged purchase of the
yearlings, and that he left to go to M. A. Tucker's house.   Hodge
said nothing on that trial about Prator's being at M. A. Tucker's
house during the evening.   Hodge told witness in Marlin, pend-
ing M. A. Tucker's trial, that he knew nothing about the year-
ling involved in this case.

John Kimble testified for the State, in rebuttal, that he was a
member of the grand jury which found the indictment.   R. C.
Hodge did not mention J. B. Prator's name when he was before
the grand jury, although he was closely questioned as to all
parties he saw at Tucker's house on the day of the alleged
trade.

The defendant's application for a continuance, referred to in
the first head note of this report, set forth that he expected to
prove by the absent witness, G. W. Hodge, that on the evening
of the purchase of the two yearlings, he met this defendant en
route from his home to Tucker's tank; that defendant told him
that he had purchased two yearlings, and asked witness to
change a ten dollar bill for him to enable him to pay for them;
that witness made the change and rode on to defendant's house,
and defendant went on to Tucker's tank; that on his arrival at
defendant's house witness saw two strangers in defendant's lot
branding two yearlings in defendant's brand; that when defend-
ant returned from the tank he paid one of the strangers for the
yearlings, and that he, defendant, and the strangers then went
into defendant's house for the avowed purpose of executing a
bill of sale, and that the witness then left.

The motion for new trial raised the questions discussed in the
opinion.

*Burrow & Kincaid* filed an elaborate brief and argument for
the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE.   When the proposed testimony of
the absent witness, Hodge, for whom a continuance is sought, is
considered in connection with the testimony adduced at the trial,
we are of opinion the court erred in overruling the motion for a
new trial.

Upon the theory of the prosecution, the chief inculpatory facts
are derived from the testimony of the State's witness Moody.

With regard specially to his testimony, defendant asked the court to instruct the jury as follows: "If you find that M. A. Tucker drove up the yearling in question, and that defendant, after it was brought to his lot, opened the gate, and had nothing to do with the original taking and driving, you will acquit; and this is so no matter what connection defendant had with it thereafter." This sixth requested instruction was directly pertinent and applicable to the facts proven, and presented the law in a concise and pointed manner to the vital issue in the case, and though, in a general way, the principle involved may be said to be covered by the general charge, still, it was nowhere presented as concisely and sharply, and we are of the opinion it was error to refuse to give said instruction in charge.

Many other errors are complained of, few, if any, of which, are likely to arise upon another trial, and therefore will not be discussed. For the two above pointed out, the judgment is reversed and the cause remanded for another trial.

*Reversed and remanded.*