No. 2434.

JAMES BOYD *v.* THE STATE.

1. THEFT—POSSESSION OF RECENTLY STOLEN PROPERTY—EVIDENCE—
CHARGE OF THE COURT.—Possession of recently stolen property is not
positive evidence of theft. At most, it is but a circumstance tending to
establish theft. A case, therefore, depending alone upon the possession
of recently stolen property is a case resting alone upon circumstantial
evidence, and in such case the omission of the trial court to charge the
jury upon the law of circumstantial evidence is material error. Note the
opinion for a state of proof to which the rule applies.

2. SAME—PRESUMPTIONS.—The general rule obtains that if a party, in whose
exclusive possession property recently stolen is found, fails reasonably to
account for his possession when called upon to explain, or when the facts
are such as to require of him an explanation, the presumption of guilt
arising from recent loss and possession will warrant a conviction without
further proof. In such case, however, it is for the jury, under proper
instructions, to determine the question of recent possession; and they
should be explicitly charged that, unless they found such possession was
recent, they would indulge no presumption of defendant's guilt because
of his being found in possession of the property. The failure of the
trial court, under the proof in this case, to charge the jury upon this
doctrine, and its refusal to give the special instruction upon the same,
was material error.

3. SAME.—In order to warrant a conviction for theft, it devolves upon the
State to show by affirmative proof the defendant's participation in or
connection with the original taking of the property. If the proof merely
connects the defendant with the property subsequent to its actual taking,
it will not authorize a conviction for theft, however manifest it may
make his guilt of another offense. See the opinion for a statement of
the rule on the doctrine.

4. SAME—CHARGE OF THE COURT.—Upon the proof in this case, which
failed to show the defendant's connection with the original taking of the
stolen property, but tended to establish his subsequent connection with
the same, with the knowledge that it was stolen, the defense requested
the trial court to charge the jury as follows: "Before the jury can
convict the defendant, they must believe beyond a reasonable doubt
that he is guilty of the original fraudulent taking, and any subsequent
connection after the taking would not be theft, either in good or bad
faith; and, if the jury believe the defendant purchased the cow from
Mixon, or any other party, after the fraudulent taking, either in good
or bad faith, he is not guilty of theft." *Held*, that under the rule an-
nounced, and under the proof stated, the refusal of the requested charge
was error.

5. SAME—ACCOMPLICE TESTIMONY, to be sufficient, must be corroborated
by other evidence, showing not merely the commission of the offense
charged, but that the defendant committed or participated in its com-
mission. Moreover, to be sufficient, such corroboration must include the
material or main issue on the trial; the main issue in this case being the
original taking of the stolen property. See the statement of the case for
a charge of the court upon the subject, *held* insufficient.

APPEAL from the District Court of Jones. Tried below be-
fore the Hon. J. V. Cockrell.

The indictment in this case charged the appellant and W. E.
Willis jointly with the theft of a cow, the property of W. T.
Wright, in Jones county, Texas, on the first day of August, 1887.
A severance being awarded, the appellant was placed upon his
trial, which resulted in conviction, and the assessment against
him of a term of four years in the penitentiary.

W. T. Wright was the first witness for the State. He testified,
in substance, that he was a resident of Taylor county. The cat-
tle owned by the witness ranged in said Taylor county, on Elm
creek, about one and a half miles west from the town of Abi-
lene. The brand of the witness was AP on the right hip. That
brand appeared on the left hip of some of his cows. The cow
described in this indictment belonged to the witness. He milked
her during the two seasons preceding her disappearance from the
range, and knew her well by the brand and by flesh marks. He
last saw this cow on his range about three months before he re-
covered her from the possession of the sheriff of Jones county.
Meanwhile witness's brand on the cow had been barred out,—
that is, a bar had been branded through and across the brand
proper,—and a fresh brand, a reversed 4 and H connected, placed
on the left side. Her ears had also been cut off. Witness knew
nothing about the taking of his said cow. He had no knowledge
of her absence from the range until he found her in Jones coun-
ty, among a number of cattle in the possession of the sheriff.
She was not taken from the range and the possession of witness
with his knowledge or consent.

Will Mixon was the next witness for the State. He testified,
in substance, that he was a tenant on the defendant's place in
Jones county, and occupied a house about two miles distant from
the residence of the defendant. Witness was at the defendant's
home place about two weeks prior to this trial, at which time a
number of cattle were branded. The branding of the said cattle

was done on Sunday evening. Will Willis, Lem Baker, defendant and witness were the parties present. The defendant's wife and Miss Edwards came to witness's house on that Sunday morning, and Mrs. Boyd told witness that her husband wanted him to go to his house and help him brand some cattle. Witness objected that the weather was too hot to go, and that he had no saddle on which to ride. Mrs. Boyd replied that witness could get a saddle at Boyd's on which to ride back. Witness then agreed to go, and went. On his arrival at defendant's place he found a number of cattle in the pen, but no person was then there. Within a few minutes, however, Willis rode up to the pen, and asked witness: "What are those cattle doing here?" Boyd and Baker arrived at the pen a few minutes later, and a discussion about the branding of the cattle ensued. Willis put an end to the discussion by exclaiming: "If you are going to brand them, let's go at it." The parties named then proceeded to brand the animals. Boyd directed witness to rope a steer, which witness did, and it was branded. Four or five others were roped and branded in like manner, Willis using the irons. Among the animals branded was the cow described in the indictment. A bar was first burned through her original brand AP, and a reversed 4 and H connected were branded on her left side. Baker, on examining the brand of one of the cows after it was thrown down, that brand being ꓯIP, exclaimed: "This cow has been monkeyed with." Willis replied: "I will fix her," and thereupon he changed the first letter, the witness thought, to a reversed B, and the last letter to R. He then burned a bar through the brand as changed. The brand on a certain steer, which was POP, was changed by the defendant himself to ROB, and a bar was then burned by him through the ROB.

While the several animals were being branded, as stated by the witness, Dan Henson came to the pen, and almost immediately the parties named went from the pen to Boyd's house. As soon as he saw Henson coming, Boyd told the parties to go to the house and get some water. He then told Henson, who was walking, that he had better take his, Henson's, mare to water; that she had not been to water since she was turned loose at the pasture gate two days before. When Henson went off, ostensibly to take his mare to water, the several named parties returned to the pen and resumed the work of branding the animals. Some time later, while the branding was still going on, Mrs. Boyd and Miss Edwards came to the pen in a hack, and Henson came

back to the pen about the same time. Boyd requested Henson to take the horses from the hack; which Henson did. Boyd then told Henson to take one of the horses and hunt his mare, which he had failed to find before. Henson took the horse and rode off in quest of his mare. Witness knew that a steer was tied down while Henson was at the pen, but he could not say whether it was branded in Henson's presence or not. Henson, however, at various stages of the branding, could have seen what was going on. After the branding of the animals, Boyd told witness that he was going to remove the cattle to Baker's pasture on the morrow, and asked witness to come early to the house and help him. The witness started to Boyd's about daylight on the next morning, and met Boyd and Baker driving the cattle towards Baker's pasture. Willis was not with them, nor did witness see him on that day—the day after the branding. Witness went on with Boyd, Baker and the cattle. They passed Deshazo's place about sun rise, and witness then saw Mr. Deshazo at his cow pen, and knew that Deshazo saw them. Boyd asked the question: "Do you think that man will know us again?" Witness replied: "I guess so; he looked at us straight enough." Witness drove the cattle, with Boyd and Baker, through the Cockrell and Pumphrey pastures to Sand Hollow, where, at about eleven o'clock, he turned back and went home. While in the Pumphrey pasture, Baker went from the cattle to Pumphrey's ranch. He had not returned when witness left the cattle, but shortly afterwards the witness turned back and saw Baker and Lewis Harrington driving some cattle. Witness then delivered to Baker a message from Boyd to hurry to the bunch he was driving. On his way home, and at about twelve o'clock, the witness met Deshazo at Mr. Tom's place, and ate a watermelon with him. On the second Sunday preceding this trial the witness went to Baker's pasture as the bearer of a note from Mrs. Boyd, defendant's wife, to Baker, telling him, Baker, that Boyd and Willis had been arrested for the theft of the cattle, and for him, Baker, to keep his mouth shut. The ear marks on several of the animals branded as stated by witness were changed, but witness could not say in what manner.

On his cross examination, witness stated that but four or five head of cattle were branded in Boyd's pen on the Sunday evening referred to by him. He did not know when the remaining animals of the bunch were put in the "4H," connected, brand. Witness had been "dodging around" during the four or five weeks

immediately preceding this trial. Part of that time he spent in Shackelford county, part of it on Dead Man's creek, in Jones county, and part of it in Taylor county. On the Wednesday succeeding his release from jail the defendant came to the witness's house and told witness that he and Willis were in a hard hole about those cattle, and asked witness if he would help him get out of it. Witness assured him that he would do all that he could legitimately do to help him. He then asked witness to give him a bill of sale, conveying to him cattle in the 4 connected H brand, which the witness refused to do. Defendant then said that witness would regret his refusal as long as he lived. Witness then started to town with a load of watermelons. Boyd accompanied him as far as his (Boyd's) house, urging him to execute the bill of sale. He offered, as inducement, his best horse and twenty-five dollars in money, for witness to execute the bill of sale. He then said that if witness did not want to leave his family, the witness could take his, Boyd's, wagon and the best pair of his horses, to remove them, and that he would not exhibit the bill of sale until the latter part of the week. He urged that if witness would keep out of the way, he and Willis could get their cases continued. Dan Henson got on witness's wagon at Boyd's house, and Boyd concluded to go to Abilene with them. Witness spoke of the case once or twice en route to town, when Boyd punched him to be silent. Dan Henson did not return home with witness and Boyd from Abilene. The witness's purpose in "dodging around" was to avoid being called to testify against defendant and Willis. On the Saturday night preceding this trial, while witness was riding on Dead Man's creek, he met a man whom he took to be Lige Carter, but was not certain of his identity. That man asked if witness's name was not Mixon. Witness replied in the affirmative, and the man asked where he was going. Witness replied that his destination was his own business. The man then said, significantly, that if witness wanted to preserve his health he had better leave the country. It was then dark, and witness was off the road. He could not, therefore, be certain that the man was Carter, but he took him to be. Witness, having heard that his life was in danger, determined, upon the strength of this episode, to go to Anson and find out what he could. He was captured at the "Shinnery" on the night before this trial by Sheriff Scarborough. He did not know how Scarborough had ascertained his whereabouts, but witness had never sent him word that he wanted to surrender. Witness

did not steal any of the cattle, nor did he know anything about the theft of the cattle that were branded in Boyd's pen. The witness thought that there might be something wrong about the cattle, but subsequently helped drive them to pasture, because Boyd asked him to. Witness denied that he ever sold Boyd any cattle. He bought a horse from Boyd during the winter preceding this trial, for which he paid him forty dollars.

Re-examined by the State, the witness admitted that in stating on his cross examination that he was arrested on the previous night at the "Shinnery" by Scarborough, he told an untruth. As a matter of fact he was captured in the brush, about half a mile from the "Shinnery" and about the same distance from the court house. His object in telling this untruth in the first instance, was that he did not want his reason for coming to court to be known. Witness came to court because Boyd had threatened him and told him that he would always regret refusing to help in the manner desired by Boyd, and because his, witness's, life had been threatened, and because witness had heard that an effort would be made by Boyd and Willis to escape by fastening the theft of the animals upon him, witness. Witness went on the "dodge" at the request of Boyd, and to enable Boyd and Willis to get their cases continued.

On his re-cross examination, the witness said that he never heard Willis claim any of the cattle that were in Boyd's pen. Willis merely helped to brand the animals, just as witness did. Boyd appeared to control and exercise authority over the cattle. The cattle were in Boyd's pen when witness first saw them. No one was at Boyd's pen when witness first arrived, but Willis reached there soon afterwards, being then on his return from Anson. Witness denied that he told Dan Henson about five weeks before this trial, at a point between his, witness's, and Boyd's houses, that he, witness, had recently purchased a horse from Boyd and Willis, paying them in trade and cattle to the amount of forty dollars. Witness never at any time, traded or sold any cattle to either Boyd or Willis. He bought the horse from Willis, and was to pay for him in the fall of 1887. He did not give his note for the purchase money, nor did he get a bill of sale from Willis. Witness was at Deshazo's camp in July, riding the horse he got from Willis. He did not think he then told Deshazo that he got the horse from Dave Harrington. The witness denied that, on the evening after the cattle were seized in Baker's pasture by the sheriff, he told either Dave or J. L.

Harrington that he had come to get the cattle, and that he was afraid he would be dragged into the trouble about them. He denied that he told the Harringtons that he had proposed to Boyd and Willis to go with him to Baird, Albany or Cisco, or anywhere else, where he was not known, for the purpose of enabling him to fabricate a bill of sale to cover the cattle. Witness had no part in the theft of the cattle, nor did he ever tell the Harringtons that he put certain of the cattle in the pasture, and directed Willis to trade them for the horse in his behalf. Witness went to the house of Judge Cockrell on the Friday night to see the district attorney, his purpose being to ascertain whether or not he had been indicted, as he had heard he would be. He told the judge and district attorney the matters he had now testified to. The district attorney made no promise of any kind to witness, but told him to keep out of the way until Monday morning, and then to bring one Forsythe to the court house, if he could. The judge said that he thought the witness had been indicted. Witness did not borrow a gun from Judge Cockrell, but Fred Cockrell, who was with witness, got a gun.

Dan Henson was the next witness for the State. He testified that he went to Boyd's house on the evening of Saturday, September 6, 1887, his destination being the pasture in which he had placed his mare. On Boyd's gallery he found Boyd, Baker, Willis and Mixon. After some talk Boyd told witness that he had better look after his mare and take her to water. Witness went off and looked for his mare. Failing to find her, he returned to the house and found Boyd in the horse lot. Mrs. Boyd and Miss Edwards had just driven up in a hack. Boyd directed witness to take the horses from the hack, and to ride one of them in search of his mare. Witness did so, and found his animal. While he was unhitching Boyd's horses from the hack the witness saw some cattle in the pen, but he did not see any of them branded. He observed, however, that a steer was lying on the ground, tied with a rope which was held by Mixon. This all occurred on Saturday evening. Witness went with Mixon to Boyd's next day, and was with Willis all day and until late in the evening. He did not see either Boyd, Baker or Mixon on that Sunday. Witness went with Mixon and Boyd to Abilene on the Wednesday succeeding Boyd's release from jail. He did not hear anything said by either Boyd or Mixon about this case. Witness did not go back from Abilene in Mixon's wagon. Witness had a conversation with Mixon about five weeks before this

trial, on the public road between the houses of Mixon and Boyd, when Mixon told him that he bought a horse from Boyd and Willis, for which he was to pay them forty dollars in trade and cattle.

Miss Willie Edwards testified, for the State, that she lived in Abilene, Taylor county, Texas. She visited the family of the defendant, in Jones county, about the time of the offense alleged in the indictment. About one o'clock on the Saturday evening preceding this trial, witness and Mrs. Boyd drove to the house of the State witness Mixon, when Mrs. Boyd told Mixon that the defendant wanted him to come to his pen at once to help about some cattle. Mixon said that he had loaned his saddle to a young man, and that he could not go without riding bare back. Mrs. Boyd repeated that Mr. Boyd particularly needed him, and Mixon agreed to go, and started off towards Boyd's house. Witness and Mrs. Boyd then went to a point on the river, and thence to Boyd's house. On their arrival at the latter place, the hack was stopped at the pen, in which there were some cattle, and near which there were some gentlemen. Witness went to the house from the pen. No person was at the house when the witness reached it. No branding was done in the pen on Sunday. Witness did not see Mr. Willis at Boyd's house on Sunday, until supper.

J. L. Harrington was the next witness for the State. He testified that he helped Boyd and Baker drive twelve head of cattle to the Baker pasture. He got with Boyd and Baker near Pumphrey's pasture. Baker found witness at Pumphrey's ranch, whence they drove one of Baker's cattle, and one of Dave Harrington's, to the bunch in possession of Boyd. The cattle driven by Boyd were fresh branded. En route to the Boyd bunch from Pumphrey's ranch, witness and Baker met a man whom witness did not know. Witness did not hear Boyd, at any time, say who owned the cattle, but heard him tell Baker that he (Baker) would get pay for the pasturage. Witness afterwards saw the cattle which the Scarboroughs got out of Baker's pasture, and recognized them as the cattle he had helped Boyd and Baker take to that pasture. One evening subsequent to the day that the cattle were taken from the pasture by the officers, the State's witness Mixon came to Dave Harrington's house, and asked about the cattle—which, he said, he wanted to get. He said that Boyd and Willis had been arrested for the theft of the animals, and he was afraid that he would be involved in the trouble about

them. He said something, which witness could not recall, about going off and fixing up a bill of sale to cover the cattle. Dave Harrington was present.

W. E. Deshazo testified, for the State, that he lived on Clear creek, in Jones county, Texas, about three miles west from James Boyd. On Sunday, about two weeks prior to this trial, Boyd and Mixon passed the witness's house, driving a small bunch of cattle. It was then about sun rise, and they were driving the cattle in a long trot. At that time the witness, with his horse, was standing near his yard gate. Mixon was at witness's camp on the sixth day of July, and was then riding a horse which he said he got from Dave Harrington.

C. B. Scarborough testified, for the State, that he assisted Sheriff Scarborough to get certain cattle from Lem Baker's pasture. All of the cattle had old brands. The old brands on some of them had been recently barred out. Twelve head of the cattle had the 4 connected H brand on them. That brand on six of them was about a month old, and had commenced to peel. The original brand on one of the cows was AP, but it was "barred out," and 4 connected H was branded on the side. These brands were fresh, not more than three or four days old. The ears of this cow had recently been cut short off. The ears of others of the cattle had also been cut off, in a manner to destroy the original mark. The cattle described by witness were taken from Baker's pasture on the second Saturday preceding this trial. On his cross examination, witness said that Willis was in the town of Anson on August fourth, fifth and sixth until noon. It was about twenty miles from Anson to Boyd's house. The 4–H brand and the new mark on the AP cow showed by blood and burned hair to be very fresh, and witness, when he first saw her, expressed the opinion that she was branded on the previous night. Defendant was in town during the entire week before witness took the cattle from Baker's pasture. Witness was an experienced stock man, and knew that the practice of stock men, in buying branded stock, was to bar out the old brands and put on new ones. It was not customary to cut off the ears of stock purchased, but, if the old marks could be easily or distinguishably changed to the purchaser's mark, the practice was to so change them; otherwise, the old marks were not interfered with.

One of the steers taken from Baker's pasture was originally branded PQP. That brand had been changed to ROB, and the ROB had been barred out with a cold iron. One of the cows

was originally branded ꓞIP. A bar had been burned through that brand, but the brand itself had not been changed.

Sheriff G. A. Scarborough testified, for the State, substantially as did C. B. Scarborough, and, in addition, that no claim on the new brands was ever made to the cattle. Boyd never claimed to own the cattle. Several of the animals were claimed, on the old brands, by different parties. The cow described in this indictment was claimed by W. T. Wright, on the AP brand. Witness got twenty-seven head of cattle from Baker's pasture, twelve of which were fresh branded 4–H connected, the 4 being reversed. Part of the cattle were taken from the pasture on Saturday, and part on Sunday.

Judge J. V. Cockrell testified, for the State, that after midnight on the Saturday preceding this trial he was awakened at his house by the arrival of his son, Fred Cockrell, and the State's witness Mixon, who wanted to see the district attorney. Mixon made about the same statement to the district attorney that he made on this trial. Witness let Mixon have his gun when he left.

The State closed.

Dave Harrington was the first witness for the defense. He testified that, on the evening after the sheriff got the "4–H connected" cattle out of Baker's pasture Mixon came to witness's house and asked witness where the cattle were. He said that he wanted to take them. Witness told him that he had called too late, as the sheriff had already taken them. Mixon then became, apparently, very uneasy, and remarked that he was afraid they would involve him in the prosecution for the theft of the animals. He talked like he had a hand in it, and said that he had proposed to the "boys" to go with him to Albany or Cisco, where he was not known, that he might execute a bill of sale to cover them. He said, also, that he put the cattle in the pasture, and told Willis to trade them for the horse. Cross examined, the witness said that he had never before testified to the foregoing facts, because he was never asked about them. He testified upon the examining trial that he did not know where Willis got the cattle. By that he meant that he did not know of his own knowledge.

Mrs. Carrie L. Boyd, the defendant's wife, testified, in his behalf, that Willis, her husband's co-defendant, had lived at her husband's house ever since he came to Texas. Witness and Miss Edwards went to Mixon's house on the day of the alleged offense,

and witness told Mixon that her husband wanted him to go to
his pen and help with cattle.   Willis was not at Boyd's house
when witness left, but was there when she got back, which was
about one o'clock.   The cattle were not in the pen when witness
left home, but were there when she got back.   Willis had been
gone, and was about Anson for about a week, until that day.
He spent that night at Boyd's house, and was there all of the
next day, which was Sunday.   Mixon, Boyd, Willis, Henson and
Baker were at the pen when witness got back from Mixon's.
Some time before that, the witness heard Mixon talking to Boyd
about the sale by him of some cattle to Boyd, but could not re-
call the words or substance of that conversation.   She merely
knew from that conversation that Boyd was to get some cattle
from Mixon.   She knew nothing about the time he was to get
them nor the price he was to pay.   Willis went to Anson on the
Monday following the Sunday of the transaction in the pen.
Witness saw no branding done, either on Saturday or Sunday.
Witness wrote a note to Baker about the cattle, and sent it by
Mixon, on the second Sunday preceding this trial.

The charge of the court referred to in the fifth head note of
this report reads as follows:   "A conviction can not be had upon
the testimony of an accomplice, unless corroborated by other
evidence tending to connect the defendant with the offense com-
mitted; and the corroboration is not sufficient if it merely shows
the commission of the offense.   An accomplice, as the word is
here used, means any one connected with the crime committed,
either as a principal offender as given you in the foregoing
charge.   It means a person connected with the crime by some
unlawful act on his part, transpiring either before, at the time
or after the commission of the offense, and depends on whether
he was present and participated in the commission of the crime
charged."

The motion for new trial raised the questions discussed in the
opinion.

*Jones & Cunningham, F. G. Thurmond* and *C. I. Evans*, for
the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE.   Appellant and one Willis were
jointly indicted for the theft of one head of cattle, the property

of one W. T. Wright. They severed on the trial, and each was separately convicted, and both cases are on appeal to this court.

By the testimony of W. G. Wright, the alleged owner, it appears that his home was in Taylor county, and that the range of the animal was on Elm creek, one and a half miles west of Abilene, in Taylor county. He had not seen the cow for three months, and did not know she had been stolen until he was notified. He found her in and received her from the possession of the sheriff of Jones county, who had taken her from the possession of the appellant and others in the latter county. There is no testimony, either positive or circumstantial, going to show that the defendants, or any one with whom they might be supposed to have been acting in concert, were ever seen taking or in possession of the cow in Taylor county. On the contrary, the first time the defendants are shown in the possession of, or as having any connection with the animal, is at the appellant Boyd's pen, some twenty miles from Anson, in Jones county, where they are shown to have changed the marks and brands upon it. At most, this evidence makes the case one of recent possession.

Recent possession is not positive evidence of theft—it is but a circumstance tending to establish it. A case dependent alone upon recent possession is a case of circumstantial testimony, and the law presenting that character of case should be submitted to the jury; because, whilst under certain conditions recent possession will support a conviction for theft, it is, in connection with such other conditions, only one of the circumstances from which the guilt is inferred. (Perry v. The State, 41 Texas, 484; Faulkner v. The State, 15 Texas Ct. App., 115; Lehman v. The State, 18 Texas Ct. App., 174; Sullivan v. The State, Id., 623; Scott v. The State, 19 Texas Ct. App., 325; Ayres v. The State, 21 Texas Ct. App., 400; Willson's Texas Crim. Laws, sec. 1299; Schultz v. The State, 20 Texas Ct. App., 308.)

Being a case of circumstantial evidence, it was error in the court to omit to charge, and was error to refuse the special requested instructions to the jury, with regard to the law governing such character of cases. With regard to recent possession, in general terms the rule is that if a party in whose exclusive possession property recently stolen is found, fails reasonably to account for his possession when called upon to explain, or when the facts are such as to require of him an explanation, the presumption of guilt arising from recent loss and possession will

warrant a conviction, without the necessity of further proof. (Robinson v. The State, 22 Texas Ct. App., 690; Willson's Texas Crim. Laws, secs. 1299, 1300.)

In such a case, however, it should be left to the jury, under proper instructions, to determine the question of recent possession, and they should be explicitly instructed that, unless they found such possession was recent, they would indulge no presumption of defendant's guilt because of the fact of his being found in possession of the property. (Bragg v. The State, 17 Texas Ct. App., 219; Curlin v. The State, 23 Texas Ct. App., 681; McCoy v. The State, 44 Texas, 616; Willson's Texas Crim. Laws, sec. 1306.) The court omitted any charge upon this branch of the law of the case, and refused a special requested instruction calling attention to the matter.

As stated above, there was no direct evidence as to the original taking of the animal. It seems quite clear, however, that the defendants had every reason to know and believe that the cow was stolen when they changed her mark and brand, and when they received her into their possession; and it does appear to us that much trouble encountered by the prosecution might have been avoided by trying the defendants as receivers of stolen property, under article 743 of the Penal Code, or perhaps better still, for altering and defacing the mark and brand, as provided in article 760, Penal Code; both of which offenses are punishable as is theft. The prosecution, however, being for theft, and it being absolutely essential in support of that charge to connect the defendant with the original taking, to warrant his conviction, without such proof of connection any subsequent guilty connection with the stolen animal, such as a receiver of the same, or as the party who had illegally altered the mark and brand, would not be sufficient to warrant the conviction for theft.

"To inculpate a defendant as a principal offender in the crime of theft, the State must show that he had some connection with or complicity in the taking of the property. It does not suffice to prove that, subsequently to the taking and without complicity therein, but with knowledge that the property had been stolen, he aided the taker to dispose of it." (Cohen v. The State, 9 Texas Ct. App., 173; McAfee v. The State, 14 Texas Ct. App., 668; Tucker v. The State, 21 Texas Ct. App., 699.)

Without a very clear and positive understanding of this principle of law, it is manifest that an ordinary jury would be misled

as to the character and weight to be attached to the subsequent inculpatory acts of defendant, though not connected with the original taking. Appreciating this danger, and to avoid it, defendant requested a special instruction, which the court refused, and which was in effect that, "before the jury can convict defendant, they must believe beyond a reasonable doubt that he is guilty of the original fraudulent taking, and any subsequent connection after the taking would not be theft, either in good or bad faith; and if the jury believed that the defendant purchased the cow from Mixon or any other party, after the fraudulent taking, either in good or bad faith, he is not guilty of theft." (Clayton v. The State, 15 Texas Ct. App., 348; Barrett v. The State, 18 Texas Ct. App., 64; Phillips v. The State, 19 Texas Ct. App., 159; Morrow v. The State, 22 Texas Ct. App., 240; Curlin v. The State, 23 Texas Ct. App., 681.) It was error to refuse this instruction under the circumstances of the case. (See Willson's Crim. Laws, sec. 1306.)

As to the testimony of the accomplice Mixon, we are of the opinion the charge was not sufficiently explicit upon the character of the corroboration. Such testimony must be corroborated not merely so as to show that such a crime as the one charged was committed, but the defendant's complicity in the crime committed. (Code Crim. Proc., art. 741.) The material matter in this case was the *original taking*—in other words, the theft of the animal—and, whilst it may be that the subsequent acts of defendant would tend in some degree to show complicity in the original taking, and whilst as to these acts the accomplice testimony was corroborated, these acts, as we have seen, did not prove the original taking, and under the circumstances developed in this case they tended very slightly, if at all, to prove it; because, whatever of corroboration there is in the evidence is alone as to matters occurring subsequent to the crime charged, that is, subsequent to the original taking or theft. As to the original taking, the accomplice himself professed to know nothing of it. It is a serious question, which we do not feel called upon now to answer, as to whether the corroboration in this case is of a character such as is contemplated by and would be held sufficient under the statute as to the main fact charged in this case. (Roach v. The State, 8 Texas Ct. App , 478; Harper v. The State, 11 Texas Ct. App., 1; Dunn v. The State, 15 Texas Ct. App., 560.) It certainly is not sufficiently conclusive, without proof *aliunde* of the

main fact—which fact, it is true, may be established by the recent possession, unexplained, of the stolen property.

For the errors we have pointed out, the judgment will be reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered January 28, 1888.