# JOE COOK v. STATE.

No. A-10243.    March 22, 1944.

(147 P. 2d 171.)

David Tant and Tellegen & Miskovsky, all of Oklahoma City, and Billingsley & Kennerly, of Wewoka, for plaintiff in error.

Randell S. Cobb, Atty. Gen., E. J. Broaddus, Asst. Atty. Gen., and Roy P. Parham, Co. Atty., of Okemah, for defendant in error.

BAREFOOT, J. Defendant, Joe Cook, was charged in the district court of Okfuskee county with the crime of grand larceny, was tried, convicted and sentenced to serve a term of five years in the State Penitentiary at McAlester, and has appealed.

This defendant was charged jointly with one Clifford Capshaw with the larceny in Okfuskee county of "one four-inch Kelly joint of the value of $400, the property of one C. M. Seran."

This property is an iron or steel rod about 40 feet in length, with a device which attaches to a rotary rig used in the drilling of oil wells. It was located on land where a well had been drilled in Okfuskee county, and was stolen from the location some time near the middle of June, 1941. Other property belonging to Mr. Seran and consisting of two sets of tongs, two jars, and an overshot, being heavy oil well equipment, was stolen at or near the same time. All of this property was afterwards found in Oklahoma county, some time near the 1st of July, 1941, and was recovered by the owner.

There is no evidence connecting this defendant in any way with the theft or asportation of this property in Okfuskee county. He was never seen or known to be in that county. The Kelly joint was recovered in Oklahoma City, Oklahoma county, during the early part of July, at the place of business of one John Schuster, who was running a machine shop at 1130 Southeast Twenty-ninth street, in Oklahoma City. It had been sawed in two and welded, making it about four feet shorter than when taken, and had been painted. One means of identifying the Kelly

joint was that it had been planed down from a six-inch Kelly to a four and a quarter inch Kelly.

Mr. Schuster testified that he knew the defendant Joe Cook, and that he saw him the early part of July, 1941, at Bill Clay's Supply store on West Main street, in Oklahoma City. That he went there after the defendant called him and told him that he had a Kelly he wanted to sell. They could not agree on the price. The next day the defendant called him (it was about the Fourth of July) "telling me that he wanted me to sell that Kelly for him, and asking if I could send to Bill Clay's and get the same. I instructed my truck driver to get it, which he did." Mr. Schuster placed the Kelly on a rack in front of his shop, out where the public could see it from the street. It was found there by the officers, and delivered to Mr. Seran, who identified it and claimed to be the owner. The only other conversation this witness had with the defendant was to tell him that the officers came out and took the Kelly joint.

This is the only evidence that in any way connected this defendant with the Kelly joint stolen in Okfuskee county, or with any of the other property stolen in that county. All of the other evidence offered by the state was with reference to the finding and identifying of the property in Oklahoma City, Oklahoma county, and of an effort by the officers to arrest the defendant; and finally of his arrest in the State of Kansas.

The defendant offered in evidence a witness named Bill Shepard. This witness had been many times convicted of a felony, and had served numerous sentences in the state and federal penitentiaries, and had a number of charges pending against him at the time he testified, including a charge for the theft of the jars, and one for the theft of the overshot lost by Mr. Seran.

The witness Shepard testified to going from Oklahoma City to Okfuskee county in the middle of June, 1941, in company with Everett Wood. He went in his car, and Wood went in a truck. That they went to an oil well and stole a Kelly joint therefrom. That it was loaded by them on the truck, and taken by Mr. Wood to Shawnee, and witness came on to Oklahoma City. That so far as he knew, it was never brought to Oklahoma City. That they started to saw it in two, but did not have time to finish it. He testified:

"Q. Did Joe Cook or Clifford Capshaw know you or this man Wood were going to take Mr. Seran's Kelly joint? A. They did not. Q. Did they know afterwards that you did? A. No, sir."

He further testified that he went back to Okfuskee county about the last Sunday in June, alone, and in the nighttime, and stole from the same place an "overshot" and "a set of tongs." He started to Oklahoma City with them, and had a flat and buried the tongs, but loaded the overshot back in the car and took it to Oklahoma City. He took it apart and left part of it at his home, "and took part of it to Capshaw's shop, and painted it." He was asked:

"Q. Now did Clifford Capshaw or Joe Cook either know you were going to take these tongs or overshot? A. They did not. Q. From the possession of Mr. Seran? A. No, sir. Q. Did they have anything to do with it? A. They did not. Q. And did you tell them afterwards that you had taken it, or did they know you had them in your possession? A. No, sir."

He further testified that on the Tuesday night following, he, in company with a man by the name of John Pressley, returned to Okfuskee county, and they stole "two sets of jars" (oil field equipment) from the same place from

which he took the other property. That he took them to Oklahoma City and hid them in the yard of the codefendant, Clifford Capshaw. With reference to this, he testified:

"Q. What did you do with them? A. I hid them down at Capshaw's yard near his house. Q. Did you see Capshaw? A. No. Q. Had you seen him since this Sunday or several days prior? A. No, I had not. Q. Tell the jury whether you ever saw Capshaw from the time you took the Kelly joint until you took the jars? A. Yes, I saw him a time or two. Q. You saw him after you got the Kelly? A. Yes, sir. Q. Did you tell him you took the Kelly joint? A. No. Q. Did you tell him you were leaving the jars down there? A. No. Q. Was there anybody there when you left them? A. His wife. Q. Did you talk to her? A. No. Q. What did you do? A. He has about an acre there and some old timber and stuff piled out there and I drove the car out there and piled them out and covered them up. Q. Do you know whether or not Mr. Capshaw knew they were there until he was arrested? A. No, I wouldn't know. Q. Did Capshaw or Cook either one know that you were going to take the jars that belonged to Mr. Seran? Mr. Parham: To which we object as calling for a conclusion. The Court: Well, I don't know how he could answer that. Q. Did you ever tell Mr. Capshaw or Mr. Cook that you were going to take these jars? A. I did not. Q. Did you ever tell either one of them you had left them on Capshaw's property there in Oklahoma City? A. No, sir, I did not. Q. Did Mr. Capshaw or Mr. Cook either have anything whatever to do with the taking of that Kelly joint, or the taking of the over-shot and the tongs, or the taking of the jars? A. They didn't. Neither one of them knew anything about it or had anything to do with it. Q. And had no interest in them? A. No."

The witness then testified to being arrested in Oklahoma county and being brought to Okfuskee county, where he had been in jail since July 4, 1941. On direct and cross-examination he testified to having made a written state-

ment to the county attorney, and this statement was introduced in evidence. It contained some contradictory statements to the evidence he gave at the trial, but it could only be received to affect his credibility as a witness. There was nothing to connect the defendant with the larceny of the property, or even with the possession thereof in Oklahoma county, except as above outlined.

Evidence was also offered to show that the property found in Oklahoma City was not the property of Mr. Seran. This was a conflict in the testimony which may not be considered.

With this statement of the evidence and the law applicable thereto, it will at once be seen that the court should have sustained the motion of defendant to direct a verdict of acquittal. And this is true after giving the state every logical inference as to the guilt of defendant. This court in a number of cases almost identical with the facts here has announced the applicable law. In the case of Dismore v. State, 60 Okla. Cr. 346, 44 P. 2d 894, the law is stated:

"Where larceny has been committed and asportation has terminated, one not connected with the original taking, either as principal or as aider or abettor, but who thereafter, with knowledge that property has been stolen, assists in concealing, selling or destroying [or dismantling the] stolen property, is not guilty of the larceny." Pass v. State, 34 Ariz. 9, 267 P. 206; Tucker v. State, 21 Tex. App. 699, 2 S. W. 893; Boyd v. State, 24 Tex. App. 570, 6 S. W. 853, 5 Am. St. Rep. 908; People v. Disperati, 11 Cal. App. 469, 105 P. 617; Reed v. State, 22 Okla. Cr. 141, 210 P. 311; Vann v. State, 21 Okla. Cr. 298, 207 P. 102.

See also the case of Underhill v. State, 70 Okla. Cr. 39, 104 P. 2d 447, 448:

"The mere fact of finding stolen property on premises, or any other place to which many others have free access,

without showing accused's actual, conscious possession thereof, discloses only prima facie constructive possession, and is not such possession as will justify an inference of guilt by reason thereof.

"The first requisite of larceny is taking possession of goods by the thief. Taking and carrying away being essential elements of the crime of larceny, no subsequent connection with the property stolen can make one guilty of theft who was not connected with the original taking."

In the case of Graham v. State, 12 Okla. Cr. 84, 152 P. 136, this court said:

"It is well settled that this court will not disturb the verdict on account of the evidence when there is evidence to support it. The converse rule is equally well settled that it is not only the province, but the duty, of the court to set aside such verdict when it is contrary to the evidence, or when there is no evidence to support it.

"The possession of stolen property recently after the larceny may or may not be an incriminating circumstance. Whether it is or not depends upon the facts and circumstances connected with such possession; and, where the testimony for the state, standing alone, raises a presumption of fact in favor of an innocent possession, and there is nothing in it from which the jury may legitimately infer a felonious taking, the evidence is insufficient to sustain a conviction."

In that case the defendant took the witness stand and in the instant case he did not do so, but the evidence of the witness Shepard was quite positive and convincing that he stole the property in question, and the evidence, if any, connecting the defendant therewith is very slight and doubtful, and under the ruling in the Dismore case would not be sufficient to convict the defendant of the larceny of the Kelly joint in Okfuskee county, the crime with which he stood charged.

The recent case of Yoder v. State, decided by this court on November 17, 1943, and reported in 78 Okla. Cr. 36, 143 P. 2d 160, 161, is almost a parallel case. There the property was stolen in Coal county and found in Pottawatomie county. Defendant was formally charged with the theft in Coal county. The proof only showed that he had attempted to sell the property in Pottawatomie county, and no evidence was offered to show his connection with, or that he aided or abetted the party who stole the property in Coal county. The judgment was reversed, it being stated in the fourth and fifth paragraphs of the syllabus:

"Where larceny is committed in 'C' County and recovered in 'P' County, and defendant is charged with the larceny in 'C' County, it is necessary to connect defendant with the larceny in 'C' County or to show that he aided and abetted the party stealing the property in 'C' County. This may be proven either by direct or circumstantial evidence.

"Where larceny has been committed and asportation has terminated, one not connected with original taking, either as principal or as aider or abettor, but who thereafter, with knowledge that the property has been stolen, assists in concealing, selling or destroying stolen property, is not guilty of larceny."

We have examined the instructions given by the court in the instant case. No exceptions were taken thereto, and no requested instructions were offered. Under this state of the record, this case would not be reversed, but we desire to call attention to the fact that no instruction was given on circumstantial evidence, and no instruction was given or requested with reference to the effect of possession of recent stolen property, which has been well defined by the law of this state. These were issues vitally involved in the trial of this case, if the jury was to pass upon the guilt or innocence of this defendant. Graham v. State, supra.

If this case is retried, the court should instruct the jury upon circumstantial evidence, and as to the effect of the possession or selling of the recent stolen property.

In the case of Herren v. State, 72 Okla. Cr. 254, 115 P. 2d 258, the defendant was charged in Carter county with the crime of receiving stolen property. The property was stolen in Johnston county. The judgment was affirmed. Under the evidence in the instant case, a charge of receiving stolen property in Oklahoma county against this defendant would have been much easier sustained than a charge of larceny by defendant in Okfuskee county.

For the reasons above stated, the judgment and sentence of the district court of Okfuskee county is reversed, and the case remanded.

JONES, P. J., concurs. DOYLE, J., not participating.